**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 26-mj-00034** |
| **v.** | : | |
| | : | |
| **CARTER CAMACHO,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION FOR DEFENDANT

On February 16, 2026, the Defendant, Carter Camacho, armed himself with a newly purchased shotgun, and purposefully drove from his home in Georgia to Washington, D.C., stopping briefly to sleep in his car overnight at a rest area. The following day, upon arriving in the District, the Defendant deliberately changed into what he described as "scary attire"—green camouflage pants, a green camouflage blouse, and a load-bearing tactical plate carrier vest—before parking his car, exiting, and charging toward the United States Capitol.

He exited his vehicle wielding a loaded shotgun, with a round chambered and the safety disengaged, and charged toward the Capitol Building. Only while ascending the south steps on the western side of the Capitol Building and being confronted by armed law enforcement officers did he ultimately stop. In a subsequent interview with investigators, the Defendant gave shifting explanations for his actions but admitted that he intended to confront Members of Congress and "scare them into speaking the truth." A handwritten note in a journal in the Defendant's car revealed a far graver motive: "My ojbtive [sic] is to kill all APICA [sic] members and croupt [sic] people of the senet/state [sic][.]"

Given the extraordinary danger posed by the Defendant's criminal conduct, as well as the other statutory factors under 18 U.S.C. § 3142(g), it is clear that no condition or combination of

conditions will reasonably assure the safety of any other person or the community, and therefore the Defendant should be held pending trial.

## BACKGROUND

### *The Charged Offense*

On February 17, 2026, at approximately 12:04 p.m., the Defendant parked a white Mercedes SUV at Maryland Avenue Southwest, between First and Third Streets, in the District of Columbia.

CCTV footage reviewed by the United States Capitol Police ("USCP") shows that, at approximately 12:07 p.m., the Defendant exited from the driver's seat of the white Mercedes SUV and began running toward the United States Capitol (the "Capitol") carrying an object later determined to be a firearm. The Defendant was wearing apparent body armor and camouflage-style clothing, as depicted in the screenshots below from the CCTV footage:





The Defendant approached the south steps on the western side of the Capitol and began ascending the stairs, which are located within Capitol Grounds. As the Defendant climbed the stairs, a uniformed USCP officer asked the Defendant what he was carrying in his hand.

The Defendant raised his right arm, in which he clutched a firearm, as depicted below:



USCP officers ordered the Defendant to halt and lay on the ground. He immediately complied.

USCP officers recovered the weapon, which was determined to be a Mossberg Model 88 12-guage shotgun, bearing serial number MV2154777. The shotgun was loaded with seven rounds in the tube and one in the chamber. The safety was off. An additional 17 rounds of ammunition were located in a carrier attached to the stock of the shotgun. The firearm and apparent body armor are more clearly depicted below:



USCP officers secured the Defendant in handcuffs. They discovered a two-way radio on his person.

The Defendant told USCP officers that his name was Carter Camacho. He also told USCP officers that he was just there to talk to a Member of Congress.

USCP officers and special agents reviewed CCTV footage and were able to trace the Defendant's path back to the white Mercedes SUV. Law enforcement then responded to the location of the vehicle. The driver's door of the white Mercedes SUV was still open. Responding officers conducted a protective sweep of the white Mercedes SUV to secure it and ensure that no other persons or dangerous objects were present.

USCP officers and special agents were able to see what appeared to be a soft-sided rifle case in the passenger compartment of the white Mercedes SUV. In addition, USCP officers and special agents were able to observe through the white Mercedes SUV windows into the tailgate area, where they saw a cardboard box with labels indicating the name "Mossberg," which is a

manufacturer of firearms, including shotguns. A USCP special agent conducted a check of the vehicle registration, which indicated that it was registered to an individual with the same last name as the Defendant.

In addition, a fixed blade knife was found on the ground approximately forty feet from the white Mercedes SUV and in the Defendant's path of travel between the vehicle and the location that the Defendant was apprehended, as depicted in the below photographs:





The south steps on the western side of the Capitol, where the Defendant was located with the firearm, fall within the Capitol Grounds as defined under 40 U.S.C. § 5102, as indicated in shaded area of the below map:



### *Interview of the Defendant*

During an interview subsequent to his arrest, the Defendant indicated that he resided with family members in Georgia. He told agents that on or about February 11, 2026, he had left his family's home, packed his things, and stayed at a motel for a number of nights. The Defendant also told investigators that he had purchased his shotgun on February 11, 2026, and picked it up on February 12, 2026. He stated that he purchased the shotgun for home defense.

The Defendant stated that he had driven from Georgia on February 16, 2026, stayed in his car overnight at a rest area in South Carolina, and arrived in the District of Columbia on February 17, 2026. During the drive, he had a phone conversation with the manager at his employer, who questioned why he was driving to D.C., but the Defendant told investigators that at that point he

8

was "already committed." In addition, the Defendant also used his cellphone to send messages such as "I love you" to other people such as family members but did not elaborate or explain his plans.

The Defendant stated that, after arriving in D.C., he parked and changed from normal clothes into a camouflage style outfit and a tactical vest that he described as "scary attire." The tactical style items worn by the Defendant at the time of his apprehension are depicted in the below photograph:



While reviewing the Defendant's property at USCP headquarters, USCP agents observed that the apparent body armor worn by the Defendant was a load-bearing, tactical-style plate carrier vest. Upon further inspection, it was determined that the inserted panels were not ballistically rated. During the interview, the Defendant stated that the vest contained foam pads intended for airsoft

use rather than ballistic-rated armor designed to provide protection against gunfire. The vest and

the removed inserts are depicted in the below photographs:





During the interview, the Defendant said that he had driven from Georgia with the safety

of his shotgun on but had turned the safety off when exiting his car. The Defendant also stated that

he had left additional weapons and weapons accessories in his vehicle, including pepper spray,

which he told investigators that he had "just in case I don't want to shoot anyone." He further

10

indicated that he considered using the shotgun to breach a door to be able to enter the Capitol.

The Defendant discussed his motive for entering the Capitol Grounds at length during the interview. The Defendant indicated that he had become interested in what politicians did "behind the window, behind cameras and all that, like the lobbying." He indicated that he was frustrated that no one "was getting penalized for it." The Defendant also stated, in sum and substance, that he was looking at news and thought, "Why are these people still here? Why are they still in office? Why hasn't anyone done anything? Nobody wants them here. They have to be punished. I've seen so many acts of treason on the news and nothing has happened. I just get so frustrated. And I was like, 'Why not just go confront them and ask them, why are you doing this?'"

The Defendant stated he was disappointed that no one does anything about it and decided to confront them. There was no one in particular that he wanted to talk to, but mainly the ones funded by AIPAC, which he told law enforcement meant all but five to twelve politicians.[1] The Defendant indicated that he just wanted to talk to Members of Congress, "and just get them to spit the truth out." He went on that he "just wanted answers from them. I just wanted them to be able to honestly answer . . . which is why I wear this scary attire, even though none of it's really real except for the gun itself, but you know what I'm saying, I would leave that there and scare them into speaking the truth." However, the Defendant also acknowledged during the interview that he had not previously tried to reach out to Members of Congress in a more traditional manner, such as by phone or correspondence.

USCP law enforcement officers ultimately searched the white Mercedes SUV and found a number of additional items, including a cell phone, laptop computer, wallet, pepper spray, bear

---

[1] The Defendant's references to AIPAC appear to be to the American Israel Public Affairs Committee.

11

spray, a knife, a pocket chainsaw, a gas mask, a hatchet, several items of tactical style clothing, a book apparently on how to make bombs titled "Improvised Munitions Black Book," and two journals. A photo of the "Improvised Munitions Black Book" is below:



Inside one of the recovered journals, a note, depicted below, stated, "My ojbtive [sic] is to kill all APICA [sic] members and croupt [sic] people of the senet/state [sic] and to fre [sic] the U.S.A. From this point all I care about is humanity to thrive and be free from the Jude. [sic]"



The journal appeared to have further entries regarding the Defendant's plan for coming to the Capitol, including earning money, practicing firing a gun, purchasing a gun, getting ammunition, learning to use tourniquets, and obtaining tactical gear.

### *Procedural History*

The Defendant was arrested on February 17, 2026. He was charged by Complaint in United States District Court for the District of Columbia with Carrying a Firearm, Dangerous Weapon, Explosive, or Incendiary Device on the Grounds of the Capitol, in violation of Title 40, United States Code, Section 5104(e)(1)(A).

At the Defendant's initial appearance on February 18, 2026, the government orally moved for detention, pursuant to 18 U.S.C. § 3142(f)(1)(E), as the offense involved a felony involving the possession of a firearm. Defense conceded to the Defendant's detention until a hearing on March 2, 2026.

**ARGUMENT**

When seeking pretrial detention, the government must establish by clear and convincing evidence that the defendant is a danger to the community. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986). That standard is met here.

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted. *Id*.; *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *Smith*, 79 F.3d at 1210; *see also Williams*, 798 F. Supp. at 36.

Under Section 3142(g), the Court must analyze four factors in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). A review and understanding of the facts and circumstances in this case should lead the Court to conclude that there is no condition or combination of conditions that would assure appearance of the defendant as required or the safety of any other person or the community were he to be released. *See* 18 U.S.C. § 3142(e)(1).

14

### A.    The Nature and Circumstances of the Offenses Charged

The first factor to be considered, the nature and circumstances of the offense charged, weighs overwhelmingly in favor of detention. The Defendant is charged with carrying a loaded shotgun on the Capitol Grounds, in violation 40 U.S.C. § 5104(e)(1)(A).

Specifically, 18 U.S.C. § 3142(g)(1) directs the Court to take into consideration "the nature and circumstances of the offense charged, including whether the offense . . . involves . . . a firearm . . . " Thus, the charge against the Defendant includes one of the separate factors that Congress explicitly intended the Court to take into account for purposes of detention.

While the Defendant is charged with a possessory offense, this Court has warned against discounting the inherent danger associated with loaded firearms. *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *7-8 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (the absence of evidence of "use" "does little to detract from" the danger posed by a firearm "loaded with 19 rounds of ammunition in an extended magazine, . . . more ammunition than the gun was originally manufactured to carry, thereby increasing its potential to do greater harm" and placement "at the ready, on his person, and easily within reach"). Not only was this firearm loaded with eight rounds of ammunition, *see United States v. Kent*, 496 F. Supp. 3d 500, 502 (D.D.C. 2020), *aff'd* (Nov. 5, 2020) (finding that a defendant should be detained pretrial in part because "the firearm recovered from the Defendant's person had a round already chambered, making the circumstances even more troubling,"), but one of the rounds was chambered and the safety off while the Defendant openly carried the weapon as he charged the Capitol Building in self-described "scary attire."

Although the charged offense is possessory, circumstantial evidence suggests that the Defendant had contemplated violent criminal conduct far beyond mere possession. He

purposefully traveled from Georgia to Washington, D.C., with a firearm and tactical gear and as he exited his vehicle, he deliberately disengaged the safety on his loaded weapon before advancing towards the Capitol.

The Defendant told the U.S. Capitol Police officer who first confronted him that he was there to speak with a Member of Congress. Later, during an interview with law enforcement, he repeatedly expressed frustration that politicians were not punished for their behavior and admitted that he intended to confront Members of Congress and "scare them into speaking the truth." He further acknowledged that he considered using the shotgun to "breach" a door to enter the Capitol Building.

The Defendant also stated that he brought pepper spray "just in case [he] didn't want to shoot anyone," yet he left that pepper spray in his vehicle. Finally, a handwritten note recovered from his car reflects that he contemplated the use of deadly force.

Thus, the nature of the offense, that the Defendant drove from Georgia to Washington, D.C., to charge the Capitol and confront Members of Congress with a loaded shotgun, weighs overwhelmingly in favor of detention.

## B.   The Weight of the Evidence

The weight of the evidence in this case strongly supports the pretrial detention of the Defendant.[2]

---

[2]   This factor should be equally weighed. In *Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150

The evidence of the offense is substantial. Multiple surveillance videos capture the Defendant running from his vehicle toward the steps of the United States Capitol while openly wielding a shotgun. He was apprehended at the scene and remained in possession of the firearm at the time of his arrest.

In a recorded post-arrest interview, the Defendant acknowledged that he had intentionally traveled to the Capitol with a firearm. The Defendant's attire and equipment at the time of his apprehension also confirm that his actions were not by mistake or accident.

Thus, the Government's evidence of the charged offenses is strong and weighs heavily in favor of detention.

## C.     The Defendant's History and Characteristics

The Defendant's history and characteristics support his pretrial detention. While the Defendant has no prior criminal history, the evidence demonstrates sustained planning, fixation, and preparation for violence that pose a significant danger to the community.

Here, the journal found in the Defendant's vehicle indicates that as far back as August, he was contemplating a plan to save money and obtain items with the objective of confronting an killing "APICA [sic] members and croupt [sic] people of the senet [sic][.]" These entries do not reflect fleeting or impulsive thoughts. Instead, they show ongoing preparation and progression towards the objective.

In an entry dated September 5, 2025, he wrote, "I shot my first gun yesterday . . . my kit is about [complete]. Just need ammo/gun." In a note dated September 9, 2025, the journal entry states "im [sic] off to work geting [sic] money for what I need[.]" In an entry dated September 10, 2025,

---

(2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

the journal entry reads, "my tourniquets came in yesterday i need more praticen using them im slowly losing it at work . . . I just need money for my gear and ammo . . . " A journal entry dated December 5, 2025, states, "im 18 and with things to do I have plans I don't discust them with anyone but I hope they understand." A note dated February 3, 2026, includes, "It's been a long 2 years so far but my God i dont know that to do anymore im thinking about buying a gun or 2 but I don't have good thoughts about them and ammor to make a bomb mabey go kill a few Jew or pedos i only need to plan it out and pray it work out in my favor." A journal entry dated February 12, 2026, says, "I bought a gun yesterday 12 ga I miss my love, my family and my friends. I must put fear into those who profit off fear and blood, i will free us with or without anyone now that i have a gun I can roam where I please no one can stop me now. May God be with us all. im preparing to go get my gun and ill stet point to leave out or stay longer." The trajectory of these entries reflects increasing radicalization and preparation, culminating in his armed travel to Washington, D.C., and advance towards the Capitol.

In short, while the Defendant lacks a criminal history, the documentary evidence reveals sustained planning, procurement of weapons and tactical gear, and contemplation of lethal violence over a period of months. Those characteristics—deliberation, preparation, and fixation—strongly support detention.

### D.    **Danger to the Community**

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the Defendant's release, also strongly supports detention.

The D.C. Circuit has noted that "'[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community,'" pretrial detention is available to "'disable the arrestee from executing that threat.'"

18

*United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021) (quoting *United States v. Salerno,* 481 U.S. 739, 755 (1987)).   This requires the Court to make a "forward looking determination" about the Defendant's risk of danger to the community, keeping in mind that detention may be justified even if the Court does not explicitly find that Defendant is a risk of committing acts of violence.   *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021) (citing *Munchel*, 991 F.3d at 1283).

Here, the Defendant's actions and words exhibit an obvious and serious threat to the community. The Defendant armed himself and traveled hundreds of miles to confront and instill fear in Government representatives at the Capitol. He exited his car with a loaded firearm, turned the safety off, and then charged at the Capitol until he was confronted by armed law enforcement. Those deliberate actions alone are powerful evidence of dangerousness.

And while the Defendant was compliant with law enforcement at the time of his arrest, his statements afterward and journal entries recovered from his vehicle reveal a broader and deeply troubling pattern. Several entries contain language contemplating extremely violent thoughts. Multiple entries contain references to harming Jewish individuals. These statements are not abstract political grievances; they reflect deep hostility and a desire to commit acts of violence towards which he took an identifiable step by charging at the Capitol with a firearm.

This history raises serious concerns that, if released, the Defendant may again attempt to act on those beliefs. His conduct reflects not an isolated lapse in judgment, but deliberate preparation over a period of months for confrontation with a firearm at the Capitol.

## CONCLUSION

Each of the statutory factors conclusively demonstrates that there is no condition or combination of conditions of release that would reasonably assure the safety of the community.

19

The Government respectfully requests that the Court issue an Order granting its motion and detaining the Defendant pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Brendan M. Horan*
BRENDAN M. HORAN
N.Y. Bar No. 5302294
Special Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
Federal Major Crimes Section
601 D Street NW
Washington, D.C. 20530
(202) 730-6871
brendan.horan@usdoj.gov

20